**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

SHAWN M. PERRY, *et al.*,        )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )        Case No. 4:22-cv-140-MTS
                                  )
ST. LOUIS COUNTY, *et al.*,       )
                                  )
          Defendants.             )

**MEMORANDUM AND ORDER**

Before the Court are Defendants Robert Rinck, Ed Fingers, James "Mitch" Ellis,[1] Brittany Klein, Marcellus Speight (collectively, "Individual Defendants"), and St. Louis County (together, "Defendants")'s Motion for Summary Judgment, Doc. [76], Defendants' Motion to Strike Plaintiffs' Affidavits, Doc. [143], and Plaintiffs Shawn Perry ("Plaintiff") and co-Plaintiffs, minor children B.M.S. and B.D.S. (together, "Plaintiffs")'s Second Motion to Appoint an Attorney ad Litem, Doc. [151].  For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.  In addition, the Court will deny Defendants' Motion to Strike and will deny Plaintiffs' Second Motion to Appoint an Attorney ad Litem as moot.

This section 1983 action arises from an investigation of Plaintiffs' home by the St. Louis County Problem Properties Unit ("PPU").  Doc. [19].  Under the operative complaint as impacted by this Court's order granting and denying Defendants' Motion to Dismiss, *compare* Doc. [19], *with* Doc. [36],  there are twelve remaining counts against four St. Louis County Police officers, the chief building inspector for the Department of Public Works, and St. Louis

---

[1] Defendant James Ellis has since deceased.  *See* Doc. [70].

1

County alleging violations of Plaintiffs' Fourth and Fourteenth Amendment rights.  More specifically, Plaintiffs assert that officers searched their home without voluntary consent (Count I), imposed an immediate order to vacate their home (Count XV), prohibited Plaintiffs from entering their home for a weeks-long period (Counts II and IV), and removed co-Plaintiffs B.M.S. and B.D.S. from Plaintiff's care (Counts IX and XI), all in violation of their Fourth Amendment rights. Additionally, Plaintiffs assert that the Defendant officers violated their Fourteenth Amendment rights when they removed B.M.S. and B.D.S. "without legal justification and/or due process." (Counts VIII, X, and XII). Further, Plaintiffs bring a claim for failure to supervise, train, or discipline against the chief building inspector in his individual capacity (Count XVI), as well as municipal-liability claims against St. Louis County asserting an unconstitutional pattern, practice, or custom (Count XIV), and a failure to train, supervise, or discipline (Count XIII), all pursuant to 42 U.S.C. § 1983.  Against the Individual Defendants, Plaintiffs seek an award of compensatory and punitive damages together with attorneys' fees, expenses, and costs under § 1983 and 42 U.S.C. § 1988.  Additionally, Plaintiff seeks an award of compensatory damages, attorneys' fees, expenses and costs against Defendant St. Louis County.  Doc. [19].

## I.    Factual Background[2]

On June 8, 2017, Defendant Robert Rinck, a St. Louis County police officer ("Officer Rinck"), and Phil Jones, a St. Louis County Problem Properties Unit Inspector ("Inspector Jones"), arrived at Plaintiff's home located within the Village of Hanley Hills.  Doc. [128] ¶ 1. Earlier that day, Village officials asked Officer Rinck to investigate the property.  Their request, as reflected in an email sent on behalf of the Acting Village Chairperson, questioned whether the

---

[2] Unless otherwise stated, the following facts are properly supported and undisputed pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 4.01(E) of the Local Rules. If genuinely disputed, the facts are viewed in a light most favorable to Plaintiffs.

home was safe or posed a "health hazard" and alleged that vehicles parked outside and used for storage "pose[d] a safety and health issue." Doc. [128] ¶ 2; Doc. [83-1]. Soon after Officer Rinck and Inspector Jones arrived, Plaintiff returned home with her domestic partner, Brian Shigemura ("Mr. Shigemura"), and her two minor children, co-Plaintiffs B.M.S. and B.D.S. Doc. [128] ¶ 5. Officer Rinck and Inspector Jones informed Mr. Shigemura, the homeowner, that they were there to inspect the property due to the condition of the home's exterior as well as the derelict vehicles stored on the premises. They also wanted to inspect inside the home. Doc. [128] ¶ 7. Mr. Shigemura refused to allow Inspector Jones and Officer Rinck inside without a warrant. Doc. [83-5] at 35, Doc. [127-2] ¶ 5. Officer Rinck called for additional police backup and was eventually joined by Defendants Brittany Klein ("Officer Klein"), James Ellis ("Officer Ellis"), and Ed Fingers ("Officer Fingers"). Doc. [128] ¶ 24.

The parties dispute what happened next. According to Plaintiff, the ensuing conversation lasted for well over an hour and became steadily more aggressive. Doc. [84-4] at 57–58. During the back-and-forth, Officer Rinck spoke with Plaintiff both privately and alongside Mr. Shigemura. *Id.* at 57. He repeatedly asked for permission to enter the home, and both Plaintiff and Mr. Shigemura refused each time. *Id.* at 57–58. Officer Rinck became angry, warning that he would get a warrant if he needed to do so, but it would make matters much worse for them. Doc. [127-2] ¶ 6. He informed Plaintiff of an outstanding arrest warrant and warned Plaintiff that, if she did not comply, he would arrest her, adding "I don't want to arrest you in front of your kids." Doc. [83-4] at 51. Plaintiff testified: "it was well over an hour that he kept insisting, and then he told me that if I didn't let him in, that I would never see my kids again." In response Plaintiff said, "I guess I don't have any other choice" and allowed both Officer Rinck and

Inspector Jones inside to conduct their investigation.[3]  *Id.* at 58.  Officer Ellis also entered the home after Officer Rinck informed him that the officers had permission to go in.  Doc. [128] ¶¶ 28–29.

The parties dispute what the officers saw inside.  Two documents in the record describe the condition of Plaintiffs' home: (1) a police report submitted by Officer Ellis, Doc. [83-6], and (2) an order to vacate that lists Inspector Jones as its author, Doc. [83-11].  Plaintiffs assert that those documents' descriptions are inaccurate or are otherwise exaggerated to justify the officers' conduct that day.  Doc. [128] ¶¶ 30–32; Doc. [127-2] ¶ 42.  Indeed, Plaintiffs assert that both the police report and order to vacate were prepared at Officer Rinck's direction such that neither Officer Ellis nor Inspector Jones exercised independent judgment when completing them.  *See* Doc. [128] ¶¶ 28, 33.[4]  Photographs of the home's interior,[5] however, confirm the following statements in the police report:

> The living room was almost completely covered with debris stacked up approximately five foot high, making most of the living room inaccessible . . . The kitchen was also full of  boxes, but the stove and sink were accessible. However, the stove and sink were piled high with dirty dishes and open food . . . There was brown liquid dripping onto the washer and dryer . . . [The children's bedroom contained] debris consisting of dirty clothes . . . tubs, boxes and toys.

---

[3] Officer Rinck denies using such tactics.  Doc. [127-10] at 302.

[4] Plaintiffs support these allegations with the following testimony: Inspector Jones' statement that, while at Plaintiffs' property, "[he] was going with what he was being told" by Officer Rinck, Doc. [127-1] at 76; and Officer Ellis' statement to his supervisor that Officer Rinck "walked him [through] as to what [Officer Rinck] wanted him to do and how to handle the investigation," Doc. [83-13] at 48.

[5] Plaintiffs object to the photographs and assert that they are inadmissible evidence for purposes of summary judgment because they constitute hearsay and lack foundation.  These objections lack merit. First, images are not statements and, thus, are not hearsay. *See United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019) (citing Fed. R. Evid. 801(a), 801(c)).  Second, "the standard [on summary judgment] is not whether the evidence . . . would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2010).  The Court is convinced that, if called at trial, either Officer Rinck or Inspector Jones could lay the proper foundation. *Cf. Schmidt v. City of Bella Villa*, 557 F.3d 564, 569 (8th Cir. 2009) (explaining that a photograph is admissible if it is "an accurate representation of the thing depicted as it appeared at the relevant time").

4

*Compare* Doc. [83-6] at 5–6, *with* Doc. [83-7].  In addition, at least one child's bed was "too full" of toys, clothing, and boxes "for anyone to sleep in." *Compare* Doc. [83-6] at 6, *with* Doc. [83-7].  The police report also states that "the cluttered condition of the home was such that, in the event of an emergency, the occupants would have a difficult time exiting the home.  Also, first responders would have difficulty entering.  The conditions were also unsanitary and posed a danger to the health of those living there."  Doc. [83-6].  Photographs also confirm the following statements made in the order to vacate: "[t]he home currently has plumbing leaks . . . [a] dismantled water heater, furnace, and electric panel . . . [and] currently has a leak at the main stack with [brown-colored residue][6] on the basement floor." *Compare* Doc. [83-11], *with* Doc. [83-7].

The order goes on to state that "the above structure has been found to be unsafe . . . contain unsafe equipment . . . be unfit for human use and occupancy . . . and/or be unlawfully occupied . . . and [the residents are] ordered to vacate this structure by 6/8/2017, and not to reoccupy without the approval of the Code Official."  Doc. [83-11].  Again, Plaintiffs assert, based on an excerpt of Inspector Jones' testimony,[7] that Jones summarily prepared and issued the order to vacate on Officer Rinck's orders.  Doc. [128] ¶ 44 Response.  Defendants counter that Inspector Jones followed standard procedures and issued the order only after reporting the conditions of the property to Department of Public Works officials—namely by sending the violations and property photographs via email or by conferring on the phone—and receiving approval from Defendant Marcellus Speight, Chief Building Inspector for the Department of Public Works ("Chief Inspector Speight").  Doc. [128] ¶ 48.  Evidence in the record indicates

---

[6] The Order identifies the substance as "raw sewage."  Doc. [83-11].  Plaintiff denies that it was.  Doc. [127-2] ¶ 42.

[7] Inspector Jones testified that he would "go with the flow" when working with Officer Rinck and that, while at Plaintiff's home, "[Jones] was going with what [he] was being told [by Officer Rinck]."  Doc. [127-13] at 73–75.

that, on June 8, 2017, Chief Inspector Speight and other department officials received an email from Officer Rinck that afternoon with a copy of the order to vacate and various photographs from the inspection attached. Doc. [145-1]. Ultimately, a notification placard signed by Inspector Jones was placed on the home stating that it was "condemned for human occupancy and use" and that the premises must be vacated immediately. Doc. [128] ¶ 43; Doc. [83-12].

Following the home inspection, one of the officers[8] called a hotline number administered by the Department of Social Services Children's Division ("Children's Division") and reported a concern for the welfare of the co-Plaintiffs, minor children B.M.S. and B.D.S. Doc. [83-6] at 6. Although Plaintiff notified all the officers at the scene that a family member was on her way to pick up and care for the children, Doc. [127-2] ¶ 14, B.M.S. and B.D.S. were taken into protective custody first by Officer Klein, then by Officer Ellis, and ultimately by the Children's Division, Doc. [128] ¶¶ 53–54.[9] Additionally, Officer Ellis placed Mr. Shigemura and Plaintiff under arrest for endangering the welfare of a child in the first degree.[10] Id. They were booked on those charges but held on their respective outstanding traffic warrants. Doc. [128] ¶ 50. Plaintiff and Mr. Shigemura posted bail and were released from jail later that night. Id. at ¶¶ 73, 74.

The next day, Plaintiff met with a Children's Division caseworker, Whitney Johnson ("Ms. Johnson," formerly Wellington, Doc. [127-16]), to answer questions concerning B.M.S. and B.D.S. and the conditions of their home. Doc. [127-5] at 4. Ms. Johnson informed Plaintiff

---

[8] The police report states that the call was placed by Officer Klein. Doc. [83-6] at 6. However, Officer Rinck remembers calling the hotline, himself. Doc. [83-2] at 145.

[9] A Family Court hearing took place on June 13, 2017. There, the Family Court Commissioner agreed with the recommendation of the Children's Division that B.M.S. and B.D.S. remain in state custody. Doc. [128] ¶ 104.

[10] Plaintiff asserts that these arrests were made solely on the orders of Officer Rinck. Doc. [128] ¶ 50. In Missouri, a person is guilty of endangering the welfare of a child in the first degree if he or she, in relevant part, "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years of age." Mo. Rev. Stat. § 568.045.

that the Children's Division would need to conduct a walkthrough of her property, and Plaintiff allowed Ms. Johnson inside to look around that same morning.  Doc. [128] ¶ 79.  Sometime during that walkthrough, Officer Fingers arrived on the property accompanied by a crime-scene van.  Doc. [128] ¶ 92; Doc. [83-4] at 108–09.  He informed Plaintiff and Mr. Shigemura that investigators needed to go inside the home to take photographs.  *Id.*  Mr. Shigemura refused. Doc. [83-5] at 50.  In response, Officer Fingers stated that the Underhill property was "sealed" and that, until they allowed investigators to photograph the home's interior, neither Plaintiff nor Mr. Shigemura could enter for any reason.  Doc. [172-2] ¶ 22; Doc. [128] ¶ 92.  Officer Rinck repeated this warning on June 21, 2017, reaffirming that, until Plaintiff and Mr. Shigemura allowed investigators to take photographs, they could not enter the home without being subject to immediate arrest.  Doc. [127-2] ¶¶ 23–26.

On June 28, 2017, Plaintiff contacted Officer Rinck's direct supervisor, Sergeant Charlie Rodriguez ("Sgt. Rodriguez").  *Id.* ¶ 33.  She informed him of the search of her property, the removal of her children, and the standing order not to reenter her home.  *Id.*  Sgt. Rodriguez advised Plaintiff that St. Louis County policy allowed individuals subject to an order to vacate to re-enter their properties during daylight hours to gather personal belongings and abate the enumerated violations.  *Id.* ¶ 34; *see* Doc. [128-2] at 96.  He assured Plaintiff that she would not be arrested if she went back inside during the permissible timeframe.  *Id.* ¶ 39.  With that reassurance, Plaintiff reentered her home on June 30, 2017.  *Id.* ¶ 40–41.  Co-Plaintiffs B.M.S. and B.D.S. returned to Plaintiff's custody on or about July 16, 2017.  Doc. [83-4] at 134.

## II.    Motion to Strike

Defendants move to strike, in their entirety, three affidavits that Plaintiffs filed to support their Additional Statement of Uncontroverted Material Facts.  Doc. [143].  Defendants object to

the affidavit of Jerome Dobson, Doc. [127-16], because: (1) it is not made with "personal knowledge of the facts in this case;" (2) its use is "self-serving, and its purpose is to create an issue of fact where there is none;" and (3) Plaintiffs never disclosed Mr. Dobson as a witness pursuant to Federal Rule of Civil Procedure 26.  Doc. [143] ¶¶ 6–8.  Additionally, Defendants move to strike the affidavit of Ms. Johnson since it allegedly contradicts previous sworn statements she made in a Missouri Department of Social Services report, and "Plaintiffs are attempting to create an issue of fact to survive summary judgment." *Id.* at ¶¶ 9–12.  Lastly, Defendants move to strike the affidavit of Michael Cross ("Mr. Cross") because it contains hearsay and self-serving statements. *Id.* ¶¶ 13–16.

Defendants move to strike pursuant to Federal Rule of Civil Procedure 56(e).  Doc. [141-4] at 2 (under seal).  However, Rule 56 was amended in 2010, and that amendment introduced subdivision (c), "establish[ing] a common procedure for several aspects of summary-judgment motions."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.  Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  And the advisory committee explains that "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.  Additionally, "[t]here is no need to make a separate motion to strike." *Id.*

Therefore, the Court will deny Defendants' Motion to Strike, but it will consider the arguments raised in the motion as properly submitted objections to the affidavits.  *See Hagen v. Siouxland Obstetrics & Gynecology, P.C.*, 934 F. Supp. 2d 1026, 1042–43 (N.D. Iowa 2013) (denying defendants motion to strike as procedurally improper but duly considering the objections raised for purposes of summary judgment); *see also Thermo Fischer Sci., Inc. v.*

*Arthur*, 4:23-cv-1098-JSD, 2023 WL 6653869, at *1 (E.D. Mo. Oct. 12, 2023) ("The Declarations which Plaintiff seeks to strike are not pleadings as contemplated by . . . Rule 7(a), and therefore, the Motion to Strike is improper under Rule 12(f)."); *and see Baker v. Union Pac. R.R. Co.*, 8:20-cv-315, 2022 WL 4132087, at *2 (D. Neb. Sept. 12, 2022) ("Rule 12(f) does not provide a basis for striking filings, motions, or exhibits that are not pleadings.").

As relevant to the objections Defendants raise, "[a] declaration used to oppose a motion 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated.'" *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (quoting Fed. R. Civ. P. 56(c)(4). An affidavit that "does not satisfy these requirements may be stricken or disregarded." *Id.* (citation omitted) (cleaned up). Additionally, "[i]t is well settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999) (internal quotations omitted). This occurs when "a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before." *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 289 (8th Cir .1988). But when, upon review, "the testimonies are not inconsistent," it would be error for the Court to disregard them. *Bass*, 232 F.3d at 618.

Finally, the Court notes that "[a] properly supported motion for summary judgment is not defeated by self-serving affidavits." *Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008) (internal quotations omitted). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Id.* And, in general, when an affidavit is properly based on the affiant's personal knowledge, "[t]he self-

serving nature of [his or her] statement bears on its credibility, not on its [admissibility]." *Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021).[11]

Accordingly, to the extent the Dobson, Johnson, or Cross Affidavits contain improper material, the Court will not consider that material for purposes of Defendants' Motion for Summary Judgment. *See*, *Hagen*, 934 F. Supp. 2d at 1043.

### III.    Motion for Summary Judgment

Defendants move for summary judgment on each of Plaintiffs' twelve remaining counts. They argue that Plaintiffs either fail to establish their claims or, regarding Plaintiffs' claims against the Individual Defendants, that each Defendant is entitled to qualified immunity. Doc. [76].  The Court addresses each of the claims in turn.

### A.  Legal Standard

1.  <u>Summary Judgment</u>

"A court must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  The movant bears the initial burden of explaining the basis for its motion, and it must identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011) (en banc).  The movant may satisfy its burden

---

[11] When a party fails to disclose, or timely supplement their disclosures, as required by Federal Rule of Civil Procedure 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).  "When fashioning a remedy . . . the district court should consider, *inter alia*, . . . the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the testimony." *Petrone v. Werner Enterprises, Inc.*, 105 F.4th 1043, 1057 (8th Cir. 2024).  The Dobson affidavit was previously filed in a case in which Defendant St. Louis County was a party.  In addition, the affidavit is merely a summary of material that is already a part of the record.  Therefore, the Court finds that the affidavit presents no real danger of surprise or prejudice to the Defendants, and the Court will not exclude the Dobson affidavit on the basis of Rule 37(c)(1).

in one of two ways.  The movant may either produce evidence negating an essential element of the non-moving party's case, or it may show the non-moving party—the Plaintiff—does not have enough evidence of an essential element of its claims to carry the ultimate burden of persuasion at trial.  *Bedford*, 880 F.3d at 996; *accord* Fed. R. Civ. P. 56(c)(1).

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed.  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."  *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir. 2007); *see also Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  If the nonmoving party fails to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof, the moving party is "entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The court views any factual disputes in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## 2.  Qualified Immunity

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of*

*Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation and internal quotation marks omitted). To be clearly established, the law at the time of the officer's conduct must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted). "The plaintiff has the burden to prove that a right was clearly established at the time of the alleged violation." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021). To meet this burden, Plaintiff must "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officer['s] conduct in the specific circumstances at issue." *Id.* "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks omitted).

### B. Discussion

#### 1. Fourteenth Amendment: Deprivation of Due Process (Counts VIII, X, XII)

The Court first addresses Plaintiffs' Fourteenth Amendment claims against the Individual Defendants. Specifically, Plaintiff and co-Plaintiffs B.M.S. and B.D.S. each bring a claim that Officers Rinck, Fingers, Klein, and Ellis ("Defendant Officers") violated their substantive due process rights when they removed B.M.S. and B.D.S. from their home "without legal justification and/or due process." Doc. [19]. Defendants argue they are entitled to summary judgment because Plaintiffs have failed to sufficiently establish these claims. Doc. [76] ¶ 6d. Alternatively, Defendants assert the affirmative defense of qualified immunity. *Id.*

To state a claim under 42 U.S.C. § 1983, Plaintiffs must show, in part, that Defendants deprived them of a federally protected right. *See West v. Atkins,* 487 U.S. 42, 48 (1988). The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of the law." U.S. Const. amend. XIV § 1. As it relates to children,

the U.S. Court of Appeals for the Eighth Circuit recognizes that parents have a liberty interest in the "care, custody, and management of their children." *See Manzano v. S.D. Dep't. of Soc. Servs.*, 60 F.3d 505, 509 (8th Cir. 1995). Moreover, "[b]oth parents and children have a liberty interest in the care and companionship of each other." *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997) (citing *Lehr v. Robertson*, 463 U.S. 248, 258 (1983)). However, this right is not absolute; rather, "the liberty interest in familial relations is limited by the compelling government interest in the protection of minor children," especially where the protection is necessary against the parents, themselves. *See Manzano*, 60 F.3d at 510 (quoting *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991)). The constitutional inquiry is thus "a balancing test which weighs the interest of the parent against the interests of the child and the state . . . ." *Manzano*, 60 F.3d at 510.

"To balance these competing interests, [the Eighth Circuit has] adopted the rule 'that when a state official pursuing a child-abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.'" *Stanley v. Hutchinson ("Stanley I")*, 899 F.3d 623, 627 (8th Cir. 2018) (quoting *Swipies v. Kofka*, 348 F.3d 701, 703 (8th Cir. 2003)). That is, "the officials' actions must have been based on a reasonable suspicion of abuse and must not have been disproportionate under the circumstances." *Abdouch v. Burger*, 426 F.3d 982, 987 (8th Cir. 2005); *see also Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 901 (8th Cir. 2020) ("The question is whether the defendants' actions and the disruption to the plaintiffs' familial relations were disproportionate under the circumstances." (citing *K.D. v. County of Crow Wing*, 434 F.3d 1051, 1056 (8th Cir. 2006))). A decision to remove a child that is not predicated on reasonable suspicion "constitutes an arbitrary abuse of government power,"

13

*Stanley v. Finnegan ("Stanley II")*, 447 F. Supp. 3d 771, 782 (W.D. Ark. 2020) (citing *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1125–26 (3d Cir. 1997)), which in turn violates due process, *see Mitchell*, 959 F.3d at 898 (citing *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013)).

Courts look at the totality of the circumstances when assessing whether there is a reasonable suspicion of child abuse, and reasonable suspicion must exist when the removal takes place. *Stanley v. Hutchinson ("Stanley III")*, 12 F.4th 834, 840–41 (8th Cir. 2021). Even if the balance between parental, child, and governmental interests reveals a constitutional violation, "qualified immunity still applies unless the constitutional violation was so clear that an objectively reasonable official would have recognized the disproportionality or lack of reasonable suspicion." *Abdouch*, 426 F.3d at 987. Moreover, the Eighth Circuit has recognized that, for these types of claims, "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis" that qualified immunity requires. *Manzano*, 60 F.3d at 510.

Viewing the evidence in a light most favorable to Plaintiffs, the Court finds that Defendants Rinck, Fingers, Ellis, and Klein are entitled to qualified immunity on Counts VIII, X, and XII because no constitutional violation occurred; that is, the officers' removal of B.M.S. and B.D.S. was based on a reasonable suspicion of child abuse, and their actions were proportional under the circumstances. *See Mitchell*, 959 F.3d at 901 (finding no constitutional violation where there was "sufficient reasonable suspicion to remove the children from their home").

Photographs of the Underhill property—taken on the day that the children were removed—paint a troubling picture. Doc. [83-7]. Multiple living spaces are so filled with storage, household objects, trash, and other debris that they are impassable. *See id.* at 12, 18, 31,

and 43.  The kitchen looks similarly cluttered and unsanitary given the accumulation of debris on the floor and the presence of trash, food scraps, and other residue on the countertop and appliances.  *Id.* at 5.  Brown liquid is seen leaking from plumbing fixtures and pooling in the basement.  *Id.* at 21, 28, 45, and 54.  The water heater and furnace are dismantled, and wires appear exposed.  *Id.* at 21, 26, and 32.  At least one child's bed appears so cluttered with personal items and other objects that it is unusable.  *Id.* at 42 and 61.  Under the totality of these circumstances, a reasonable officer could suspect that B.M.S. and B.D.S. experienced neglect in this environment and that their home presented a risk to their health and safety.  *See, e.g.*, *In re D.K.S.*, 106 S.W.3d 616, 617 (Mo. Ct. App. 2003) (describing protective custody of a child taken after allegations of an unsafe and unsanitary home that had dirty clothing scattered throughout, a roach infestation, and soiled mattresses).

The next question is whether the decision to immediately remove B.M.S. and B.D.S. from their home was proportional to the reasonable suspicion that the Defendant Officers acquired under the circumstances.  *See Thomason v. SCAN Vol. Servs., Inc.*, 85 F.3d 1365, 1371–72 (8th Cir. 1996) ("The difficulty . . . is not whether such a reasonable suspicion can be found, but rather, whether the actions taken [were proportional].").  Plaintiffs argue that the removal was improper because the Defendant Officers never communicated with B.M.S. or B.D.S. before removing them; nor does it appear that the officers examined the children for signs of neglect.  Doc. [127] at 25.  Moreover, Plaintiff asserts that she notified "everyone at the scene" that a family member was on her way to the home to care for the children.  Doc. [127-2] ¶¶ 12, 14; *see Whisman*, 119 F.3d at 1310 (finding removal improper, in part, because a relative had agreed to pick up the child before officers took custody).  Taken together, Plaintiffs assert that the removal

15

of B.M.S. and B.D.S. was disproportionate to the circumstances known to the Defendant Officers at the time.

These arguments are unavailing.  First, "[o]nce reasonable suspicion is present, investigators are not obligated to investigate the matter fully before deciding to remove children from the custody of their parents." *Stanley II*, 447 F. Supp. 3d at 782 (W.D. Ark. 2020) (citing *Croft*, 103 F.3d at 1125–26).  This case is not like *Stanley I*, where, based on the allegations in the complaint, the Eighth Circuit upheld the district court's decision to withhold qualified immunity from officers who initiated an investigation premised on "bizarre" accusations of child abuse that "cried out for investigation and confirmation."  899 F.3d at 628.  Critically, those officers decided to remove the plaintiffs' children despite "plainly exculpatory evidence" uncovered during that investigation.  *Id.*  Here, the Defendant Officers did not base their actions on far-fetched allegations that needed follow-up; instead, they were confronted with what plainly appeared to be an unhealthy and unsafe living environment, and thus, developed reasonable suspicion that B.M.S. and B.D.S. faced ongoing and future harm.  Once they manifested that suspicion, the Defendant Officers were "not obligated to investigate the matter fully" before removing the children from the very living conditions that raised their suspicion in the first place. *Stanley II*, 447 F. Supp. 3d at 783.

Second, under the circumstances, the Defendant Officers did not need to wait for a relative before placing the children in protective custody.  *See K.D.*, 434 F.3d at 1057 ("[W]e cannot fault [d]efendants for deciding to place [a child] in temporary foster care rather than with his grandmother, a person unknown to social services.").  At or around the time the Defendant Officers removed the children, Officer Ellis arrested both Plaintiff and Mr. Shigemura for child endangerment.  Doc. [128] ¶ 50.  The Defendant Officers needed to exercise protective custody

16

over the children because neither parent was—or soon would be—able to care for them once under arrest.  Further, there is no evidence indicating that the Defendant Officers knew the relative in question or whether she would be able to adequately care for B.M.S. or B.D.S.  The record shows that the children were placed and held in foster care for five days before a June 13, 2017, Family Court hearing, and the commissioner adopted the recommendation of the Children's Division to retain custody over B.M.S. and B.D.S. at that proceeding.  Doc. [128] ¶ 104; Doc. [91-5] at 4.  Under these circumstances, the Defendant Officer's "intrusion into the familial relationship was not so disproportionate to the potential risk to [the children]'s well-being as to rise to the level of a constitutional violation."  *K.D.*, 434 F.3d at 1057.

Plaintiffs raise additional arguments as to Officer Rinck and assert that this Court should not grant summary judgment in *his* favor because his actions were based on an improper motive: either vindictiveness and anger over Plaintiff's refusal to consent to the search of her home or a generalized desire to get certain people "out of the neighborhood."  Doc. [127] at 25; Doc. [127-14] ¶ 7.  Even assuming Officer Rinck's subjective motives are properly supported in the record, these arguments are misplaced.  In this context, an officer is entitled to qualified immunity unless, under the circumstances, an "*objectively* reasonable official would have recognized the disproportionality or lack of reasonable suspicion."  *Abdouch*, 426 F.3d at 987 (emphasis added).  And this makes sense because the reasonable suspicion that officers must have before removing a child "is properly framed by cases establishing the Fourth Amendment standard that applies to police officers and investigators in making arrests and other seizures."  *Stanley I*, 899 F.3d at 628.  In the Fourth Amendment context, an officer's subjective intentions do not play a role in either the probable-cause or reasonable-suspicion analysis.  *See Whren v. United States*, 517 U.S. 806, 813 (1996).  Because, as explained above, the removal of B.M.S. and B.D.S. was a

17

proportional response to a reasonable suspicion of abuse, Officer Rinck is entitled to qualified immunity just as Officers Klein, Ellis, and Fingers. Accordingly, the Court will grant Defendants summary judgment on these counts.

### 2. Fourth Amendment Claims (Counts I, II, IV, IX, XI, XV)

The Court next addresses Plaintiffs' claims concerning Fourth Amendment violations. Plaintiffs assert that: (1) Officer Rinck violated Plaintiff's right against unreasonable searches when he entered her home without her consent (Count I); (2) Chief Inspector Speight violated Plaintiff's right against unreasonable seizures when he authorized an immediate order to vacate her home (Count XV); (3) Officer Rinck and Officer Fingers unreasonably seized Plaintiff's home when they forbade her from entering her home under threat of immediate arrest for a period of three weeks (Counts II and IV); and Officers Ellis and Klein violated the Fourth Amendment rights of co-Plaintiff's B.M.S. and B.D.S. when those officers removed them from their family and placed them into protective custody (Counts IX and XI).  The Individual Defendants move for summary judgment on each of these claims because Plaintiffs have either failed to establish a violation of their rights under § 1983 or, even if a violation took place, the named defendants did not cause the violation.  Doc. [76] ¶¶ 6a–c, e.  Alternatively, the Individual Defendants assert qualified immunity on each claim.  *Id.* ¶ 6j.

As relevant to each of these claims, the Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

### a. Unlawful Search against Officer Rinck (Count I)

"The Fourth Amendment generally prohibits police from entering a home without a warrant unless the circumstances fit an established exception to the warrant requirement."

*United States v. Varner*, 481 F.3d 569, 571 (8th Cir. 2007). One such exception to the warrant requirement is consent, and "[a]n individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Rambo*, 789 F.2d 1289, 1296 (8th Cir. 1986) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973)). Although the government bears the burden of showing consent was freely and voluntarily given in criminal cases, *see United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005) (citation omitted), in § 1983 civil actions, the plaintiff bears "the burden of proving that [he or she] did not knowingly and voluntarily consent to [an officer's] entrance into the home." *Der v. Connolly*, 666 F.3d 1120, 1129 (8th Cir. 2012).

When determining whether consent was freely and voluntarily given, courts generally consider several factors specific to the individual who allegedly gave consent; these include: (1) the age and general intelligence and education of the individual, (2) whether the individual was under the influence of drugs or alcohol, (3) whether the individual was informed of her *Miranda* rights, and (4) whether she had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals. *Sanders*, 424 F.3d at 773 (citing *Untied States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990)). Additionally, courts consider certain external factors, including: (1) the length of time the individual was detained, (2) whether the police threatened, physically intimidated, or punished the suspect, (3) whether the police made promises or misrepresentations, (4) whether the suspect was in custody or under arrest at the time of consent, (5) whether the consent occurred in a public or secluded place, and (6) whether the suspect stood by silently as the search occurred. *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001). No single factor is dispositive or controlling, and the factors shall not be applied

mechanically. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). Whether consent was voluntarily given is a question of fact. *See Der*, 666 F.3d at 1129 (affirming the jury instruction placing the burden to prove voluntary consent on the plaintiff).

Defendants argue that this Court should grant Officer Rinck summary judgment on Count I because, based on the above factors, Plaintiff gave him free and voluntary consent to search her home. Doc. [76] ¶ 6b. However, viewing the evidence in a light most favorable to Plaintiff, the Court finds that there is a genuine dispute of fact as to whether Plaintiff's eventual consent was uncoerced. Plaintiff states that she allowed Officer Rinck and Inspector Jones into her home only after an hour-long, heated exchange on her property—at times surrounded by at least four police officers—during which she repeatedly denied the officers entry into her home. Doc. [84-4] at 51, 57–58, 67; Doc. [127-2] ¶ 5. She permitted Officer Rinck and other officials inside only after Officer Rinck made various threats, culminating in an explicit ultimatum that, if Plaintiff did not let him inside, she would never see her kids again. Doc. [84] at 58. Only then did Plaintiff relent, saying, "I guess I don't have any other choice." *Id.*

The Court finds that, based on this record, a reasonable factfinder could conclude that Plaintiff's consent to search her home was involuntary. Defendants disagree and point to various aspects of the June 8 incident which, they assert, demonstrate that Plaintiff's consent was voluntary, including that: (1) the incident took place in public and in broad daylight, Doc. [128] ¶ 15; (2) neither Plaintiff nor Mr. Shigemura were handcuffed when Officer Rinck and Inspector Jones entered the home, Doc. [128] ¶ 15; (3) Plaintiff walked about the property while the investigation was taking place, *id.*; (4) Plaintiff had one prior arrest when she was eighteen years old and thus had a familiarity with law enforcement, Doc. [128] ¶ 9; (5) at the time of the incident, Plaintiff was forty-two years old and had attended a few semesters at a community

20

college, Doc. [128] ¶ 19; and (6) Plaintiff was not intoxicated during the incident.  Doc. [128] ¶ 21.

 By adding up these various factors, Defendants move this Court to find Plaintiff's consent voluntary as a matter of law.  But doing so would require the type of impermissible, "mechanical" application of the voluntariness factors that this Court cannot undertake. *See Bradley*, 234 F.3d at 366.  At bottom, the voluntariness factors help a court determine whether "consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *Rambo*, 789 F.2d at 1296.  None of the various circumstances raised by Defendants subtract from the record evidence that Plaintiff repeatedly refused officers entry into her home over the course of an hour, and she gave in, saying "I guess I don't have any other choice," only after Officer Rinck threatened that she would never see her children again.  Doc. [83-4] at 58.  Under such circumstances, a reasonable factfinder could find that Plaintiff's consent was involuntary and, thus, Officer Rinck violated Plaintiff's Fourth Amendment rights when he searched her home.

Still, qualified immunity requires further analysis.  Having found a constitutional violation for purposes of summary judgment, the next question is whether "the unlawfulness of [Officer Rinck's] conduct was clearly established at the time." *Wesby*, 583 U.S. at 63.  In other words, the Court must determine whether "a reasonable official in [Officer Rinck]'s position would have known that he was violating the constitution when he searched [Plaintiff's] house . . . in the particular circumstances." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018).

The Court finds that a reasonable official would have known Officer Rinck's conduct was unlawful.  At the time of the incident, it was clearly established that threatening a mother with the removal of her children if she failed to cooperate with police constituted coercion that

21

violates the Fourth Amendment. *See Lynum v. Illinois*, 372 U.S. 528, 534 (1963) (finding a confession coerced when, surrounded by three officers, police threatened to take a woman's children away from her "if she did not cooperate"); *see also Goings v. Chickasaw County*, 523 F. Supp. 2d 892, 912 (N.D. Iowa 2007) ("[A]n explicit threat to a suspect's children usually renders involuntary any purported subsequent consent."); *and see United States v. Tingle*, 658 F.2d 1332, 1335–36 (9th Cir. 1981) (finding that officers were "patently coercive" when threatening a mother that she would not see her child for a long time amidst warnings of a long prison term).

Here, viewing the evidence in favor of Plaintiff, Officer Rinck used various tactics to acquire Plaintiff's consent during an hour-long exchange, including: (1) a generalized threat that matters would become worse if Plaintiff made him get a warrant, Doc. [127-2] ¶ 6; (2) agreeing not to take Plaintiff's children if she consented to a search, *id.* ¶ 11; (3) acknowledging the existence of outstanding traffic warrants and the possibility of arresting Plaintiff in front of her children, Doc. [83-4] at 51; and (4) threatening that Plaintiff would never see her children again if she did not comply, *id.* at 57–58. When Plaintiff acquiesced, saying "I guess I don't have any other choice," *id.*, a reasonable official in Officer Rinck's position "would have known that he was violating the constitution" when he commenced his search of Plaintiff's home based on that purported consent. *See Wallace*, 881 F.3d at 1060. Therefore, the Court will deny summary judgment on Count I.

### b.  Unlawful Seizure: Order to Vacate (Count XV)

"To establish [an unlawful seizure] in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). Under the Fourth Amendment, "[a] 'seizure' of property occurs when there is some

meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Issuing an order that compels a person to vacate his or her home constitutes a "meaningful interference with an individual's possessory interests in that property" such that it is a seizure under the Fourth Amendment.  *Jacobsen*, 466 U.S. at 113; *see also Gaetjens v. City of Loves Park*, 4 F.4th 487, 492 (7th Cir. 2021) (finding that officials seized a home when issuing a temporary eviction order).

However, the Fourth Amendment does not prohibit *all* governmental seizures; instead, only unreasonable seizures are forbidden. *See Torres v. Madrid*, 592 U.S. 306, 323 (2021). When analyzing the reasonableness of a seizure, "[c]ourts 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  *Seymour v. City of Des Moines*, 519 F.3d 790, 796 (8th Cir. 2008) (quoting *Untied States v. Place*, 462 U.S. 696, 703 (1983)).  The Court is mindful that "when it comes to the Fourth Amendment, the home is the first among equals.  At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation and internal quotation marks omitted).  But municipalities have a strong interest in maintaining public health and safety through the enforcement of their building ordinances. *See Freeman v. City of Dallas*, 242 F.3d 642, 652 (5th Cir. 2001) (citing *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594–95 (1962)) ("Regulation of nuisance properties is at the heart of the municipal police power.").  Indeed, "[p]rotection of the health and safety of the public is a paramount governmental interest . . . ."  *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981).

The proper balance of these opposing governmental and private interests is illustrated by the exigent-circumstances exception to Fourth Amendment's warrant requirement. Although "[s]earches and seizures inside a home without a warrant are presumptively unreasonable," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)), "[a]n exception to the warrant requirement applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search [or seizure] is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citation and internal quotation marks omitted). After all, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (quoting *Wayne v. United States*, 314 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.))

"Exigent circumstances exist where [officers] have a legitimate concern for themselves or others . . . [and] the analysis . . . is an objective one focusing on what a reasonable, experienced [officer] would believe." *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (internal quotations omitted). Thus, the warrantless seizure of a home through a condemnation order or abatement proceeding is permissible under the Fourth Amendment when the seizure is supported by an objectively reasonable belief that the property poses a "safety threat" that requires immediate action. *See Gaetjens*, 4 F.4th at 494–95 (first citing *Wonsey v. City of Chicago*, 940 F.3d 394, 398–401 (7th Cir. 2019); then citing *Flatford v. City of Monroe*, 17 F.3d 162, 170–71 (6th Cir. 1994)) (finding no Fourth Amendment violation when, in response to noxious odors inside a home, officers issued a condemnation order without a warrant).

St. Louis County furthers its governmental interests through an ordinance that authorizes building officials to issue an immediate order to vacate a structure when it poses an "imminent

danger."[12]  As relevant here, a building constitutes an imminent danger "[w]hen, in the opinion

of the code official . . . there is actual or potential danger to the building occupants . . . because

of . . . operation of defective or dangerous equipment."  St. Louis County, Mo., Rev. Ordinances,

title XI, ch. 1110.109.1 (2017).  Once that finding is made, "the code official is . . . authorized

and empowered to order and require the occupants to vacate the premises forthwith."  *Id.*  Thus,

according to the ordinance, immediate evictions can take place only after exigent circumstances

have been found; that is, the order cannot issue until a code official has determined that the

building presents a danger to its occupants.  The issue, therefore, is whether a reasonable official

"could conclude that [Plaintiff and her family] might be imminently endangered" by the

condition of their home.  *See Flatford*, 17 F.3d 167, (5th Cir. 1994) (finding that an eviction,

undertaken through an ordinance authorizing immediate eviction from premises found to be

"immediately dangerous," fell within the exigency exception to both the Fourth and Fourteenth

Amendments because of the building's dilapidated state).

Viewing the evidence in Plaintiff's favor, a reasonable official could have concluded that

Plaintiff's home constituted an imminent threat.  The order to vacate designates Plaintiff's home

as an "Imminent Danger" under "Violation 2 1110.109.1."  Doc. [83-10].  That section repeats

the ordinance language quoted above and states the following to substantiate its determination:

"[c]urrently the home has plumbing leaks of raw sewage, dismantled water heater, furnace and

---

[12] By 2017, St. Louis County had adopted the ICC International Property Maintenance Code, edition 2009, ("IPMC") as its own property maintenance code.  St. Louis County, Mo., Rev. Ordinances, title XI, ch. 1110.30.  Thus, the seven building code violations identified in the order to vacate, Doc. [83-10], correspond to the section headings and subheadings enumerated in the IPMC.  *Compare* Int'l Prop. Maint. Code, ch. 1, § 108.1.3, *with* Doc. [83-10] (describing, for example, a "structure unfit for human occupancy" under Violation 1 1110.108.1.3 with language identical to the IPMC § 108.1.3).

electric panel, all of which constitute imminent dangers." *Id.*[13]   In other words, the order describes the "operation of defective or dangerous equipment" which, in turn, reasonably presents an "actual or potential danger to the building occupants." *See* St. Louis County, Mo., Rev. Ordinances, title XI, ch. 1110.109.1 (2017).

Photographs of the property corroborate the existence of these conditions.  *See* Doc. [83-7] at 21, 26, 28, 32, 45, and 54; *cf. Scott v. Tempelmeyer*, 897 F.3d 1067, 1072 (8th Cir. 2017) (describing a condemnation order issued based on photographs showing "insanitary conditions, filth, and contamination" as well as safety hazards, including improper maintenance of mechanical, electrical, and plumbing systems). Issuing the immediate order to vacate was therefore reasonable and the resulting seizure was likewise valid under the Fourth Amendment because the state of Plaintiff's property provided "a reasonable basis on which to conclude that the home posed an immediate danger to its occupants." *Gaetjens*, 4 F.4th at 494 (citing *Flatford*, 17 F.3d at 171).

But Plaintiff still challenges Chief Inspector Speight's *approval* of the immediate order and argues that the resulting seizure of her home is unreasonable because his authorization was a mere rubberstamp, administered without ascertaining whether Plaintiff's property constituted an imminent danger.  Doc. [19] ¶ 84.  Even assuming such circumstances would render the seizure of Plaintiff's home unreasonable under the Fourth Amendment given the *objective* exigent-circumstances standard described above, *see Kuenstler*, 325 F.3d at 1021, the evidence in the record does not support Plaintiff's allegation.  *See Thomas*, 483 F.3d at 526–27 ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

---

[13] The order to vacate also describes an appeal process that gives the recipient thirty days to object and assert a "claim that [the] notice of violation improperly interprets the property maintenance code . . . or that the provisions of the property maintenance code [do] not apply."  Doc. [83-10].

It is undisputed that Chief Inspector Speight authorized the order at issue; the only dispute is whether his approval came after due consideration. Doc. [128] ¶ 48 and Response. Inspector Jones testified that, to issue an order to vacate, he would compile data along with photographs of the violations he found and "send that up" to Chief Inspector Speight for approval either by email or phone call. Doc. [127-13] at 24–26. Chief Inspector Speight recalls receiving an email regarding Plaintiff's property, Doc. [128-2] at 72, viewing photographs of the property, *id.* at 70, and discussing the property over the phone, *id.* at 69. Lastly, an email sent from Officer Rinck to Chief Inspector Speight and other public works officials on June 8, 2017, attaches a copy of the order to vacate and dozens of photographs of the Underhill property. Doc. [145-1]. Plaintiff has put forth no evidence from which a reasonable factfinder could conclude that Chief Inspector Speight issued the order to vacate without ascertaining the conditions of the home. Therefore, neither the order to vacate nor Chief Inspector Speight's approval of the order is unconstitutionally unreasonable. Accordingly, the Court grants Defendants summary judgment on this claim.

### c.  Unlawful Seizure: Prohibiting Entry to the Home (Counts II and IV)

Again, a Fourth-Amendment seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113. When Officers Fingers and Rinck ordered, under threat of arrest, that Plaintiff's home was indefinitely "sealed" until Plaintiff would permit crime-scene investigators inside to photograph the property, *see* Doc. [172-2] ¶ 22–26; Doc. [128] ¶ 92, they asserted "dominion and control over [Plaintiff's] home . . . as part of their investigation into [alleged child endangerment]" such

that a seizure took place.[14] *See United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018) (citing *Jacobsen*, 466 U.S. at 120, 120 n.18) (finding a Fourth Amendment seizure when officers secured a home to investigate a death); *see also Segura v. United States*, 468 U.S. 796, 811 (1984) (plurality) (explaining that a perimeter stakeout of a home interferes with the possessory interests of its owners); *and see Audio Odyssey, Ltd. v. Brenton First Nat'l. Bank*, 245 F.3d 721, 735–36 (8th Cir 2001) (holding that excluding owners from commercial property constituted a Fourth Amendment seizure), *aff'd on reh'g*, 286 F.3d 498 (8th Cir. 2002).

However, even if a governmental seizure takes place, there is no constitutional violation if that seizure is reasonable. *See United States. v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008) (explaining that Fourth Amendment challenges are reviewed for reasonableness). The Supreme Court has held that police officers can, consistent with the Fourth Amendment, restrict access to a home when they have probable cause to believe the seizure is necessary to preserve evidence of a crime, but only for a reasonable period "while the police diligently obtain[] a warrant." *Illinois v. McArthur*, 531 U.S. 326, 334 (2001). In other words, the duration of such a seizure cannot be indefinite. *See United States v. Mays*, 993 F.3d 607, 616 (8th Cir. 2021) (quoting *Segura*, 468 U.S. 796 at 812 (plurality)) ("A seizure reasonable at its inception . . . may become unreasonable as a result of its duration."). Indeed, "'[t]he duration of [a] seizure pending the issuance of search warrant must still be reasonable,' and reasonableness 'is measured in objective terms by

---

[14] Defendants' arguments as to causation are unavailing. They assert that Officers Fingers and Rinck cannot be held responsible for the seizure of Plaintiff's home under § 1983 because the directive prohibiting Plaintiffs from entering their home came from elsewhere and they "were merely passing that information along." Doc. [79-1] at 13–14. True, a successful § 1983 claim requires "a causal link to, and direct responsibility for, the deprivation of rights," *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990), but this means that "defendants must be individually involved in the unconstitutional act to be liable under § 1983," *Quraishi v. St. Charles County*, 986 F.3d 831, 837 (8th Cir. 2021). Further, even if the directive to "seal" Plaintiffs' home came from another County official, an officer is not immune from § 1983 liability merely because "a superior instructs him to engage in unconstitutional conduct." *Id.* It is undisputed that Officer Fingers and Officer Rinck were involved in this deprivation; they were the ones who gave Plaintiff the ultimatum forcing her to stay out of her house.

28

examining the totality of the circumstances.'" *Id.* at 616–17 (first quoting *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993); then quoting *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012)).  Consistent in each of these cases is the principle that a seizure may be reasonable when it is: (1) undertaken to maintain the evidentiary status quo while officers work to acquire a warrant, and (2) the length of that seizure is itself reasonable under the circumstances.

The record here indicates that Officer Fingers and Officer Rinck had probable cause to believe Plaintiff's home contained evidence of a crime, namely the living conditions that prompted Plaintiff's arrest for child endangerment.  *See McArthur*, 531 U.S. at 331–32.  And they may have reasonably believed that, if Plaintiff reentered the property to remedy those conditions, as the order to vacate permitted her to do, *see* Doc. [83-10], evidence of that crime would vanish.  *See McArthur*, 531 U.S. at 332.  But there is no indication that Officer Fingers and Officer Rinck imposed this restriction while they sought a search warrant.  Indeed, it does not appear that they even *planned* to acquire—much less took concrete steps to acquire—a search warrant that would permit investigators to enter and photograph the home after Plaintiff and Mr. Shigemura refused to allow them inside.  *Cf. Mays*, 993 F.3d at 617–18 (finding a fifteen-day delay between seizing property and receiving a search warrant was reasonable given the diligence the officers displayed in securing the warrant amidst a particularly complex criminal investigation).  The Court therefore finds the length of Officer Fingers and Officer Rinck's indefinite seizure of Plaintiff's home unreasonable under the circumstances and, thus, a violation of the Fourth Amendment.

However, there is still the matter of qualified immunity.  It is not enough for Officer Fingers and Officer Rinck to have violated Plaintiff's constitutional rights.  They are still entitled

to summary judgment unless "the unlawfulness of their conduct was clearly established at the time." *Wesby*, 583 U.S. at 63 (2018).  This standard does not require "a case directly on point, but existing law must have placed the constitutionality of the officer's conduct beyond debate." *al-Kidd*, 563 U.S. at 741 (2011).  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Wesby*, 583 U.S. at 63 (citation omitted).  And clearly established law must not be defined "at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id* at 63–64 (internal quotations omitted).  Instead, "a high 'degree of specificity'" is required. *Id.* at 63 (quoting *Mullenix. v. Luna*, 577 U.S. at 13). It is Plaintiffs' burden to demonstrate that the unlawfulness of Defendants' conduct was clearly established.  *See Kasiah v. Crowd Sys., Inc.*, 915 F.3d 1179, 1185 (8th Cir. 2019); *see also Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("[T]he plaintiff must demonstrate that the law is clearly established.").

In short, Plaintiff has failed to direct the Court to precedent holding a seizure unconstitutional "in the particular circumstances that [Officer Fingers and Officer Rinck] faced." *Wesby*, 583 at 63–64.  Nor has the Court been able to locate any after undertaking its own search. *See Bell v. Neukirch*, 979 F.3d 594, 613 (8th Cir. 2020) (Stras, J., concurring in part and dissenting in part) ("The bottom line is that neither [plaintiff] nor the court has identified a single precedent finding a Fourth Amendment violation under similar circumstances.").  This is unsurprising because the seizure of Plaintiff's home occurred amidst very peculiar circumstances.  At the time Officer Fingers warned Plaintiff to stay out of her home until crime-scene investigators could photograph its interior, she and her domestic partner had been arrested for child endangerment, and the property was under a condemnation order for various building

code violations, including designations that the home was an "Imminent Danger" as well as a "Structure unfit for human occupancy." Doc. [83-10]. The Fourth Amendment implications given these particular circumstances are admittedly complex.

On the one hand, "even when a home can no longer be occupied, a person retains a privacy interest in their property and the [Fourth Amendment] warrant requirement applies." *Appel v. City of St. Louis*, 4:05-cv-772-SNL, 2007 WL 9808053, at *7 (E.D. Mo. Aug. 15, 2007) (collecting cases) (finding an objectively reasonable privacy interest in a damaged home that was more than "mere ruins"). But on the other, "[w]hen a building has been condemned as unsafe for human occupation, it becomes, at least from the government's perspective, an abandoned structure. Public health and safety require that police officers, as well as building inspectors, have the right to access such structures at any time for a variety of reasons . . . . [including] for the purpose of evicting occupants." *Cross v. Mokwa*, 547 F.3d 890, 895–96 (8th Cir. 2008) (finding exigent circumstances permitted officers to enter condemned homes without a warrant to arrest illegal occupants).

And while the Supreme Court has rejected a general "crime-scene exception" to the Fourth Amendment warrant requirement, *see Flippo v. West Virginia*, 528 U.S. 11, 13–14 (1999), the Eighth Circuit has stated "we assume there is an adequate law enforcement reason for seizing real property for a fairly long time to secure a crime scene," *Audio Odyssey*, 245 F.3d at 736 n.16, such that a seizure under that circumstance would be constitutionally permissible. The upshot is that, under the particular circumstances of a property that was simultaneously condemned *and* a crime scene, the law was not so clearly established that "every reasonable official" would know that Officer Fingers' and Officer Rinck's conduct was unlawful. *See*

31

*Wesby*, 583 U.S. at 63.  Therefore, the Court will grant Defendants qualified immunity on Counts II and IV.

    d.  <u>Unlawful Seizure: Removal of B.M.S. and B.D.S. (Counts IX and XI)</u>

The final Fourth Amendment claims are brought by co-Plaintiffs B.M.S. and B.D.S., challenging their removal from their parents by Officer Klein and Officer Ellis.  Doc. [19] ¶¶ 153, 164.  The Eighth Circuit has held that "reasonable suspicion is the governing standard" applied to a Fourth Amendment claim asserting that officers unreasonably removed a child from their parents.  *Stanley III*, 12 F.4th at 842 ("[The Eighth Circuit has] never held that children have a Fourth Amendment right not to be separated from their parents absent probable cause to believe the parents are guilty of child abuse.").  Having already found the removal of B.M.S. and B.D.S. supported by reasonable suspicion above, the Court will grant Defendants Ellis and Klein summary judgment on Counts IX and XI.  *See Welter v. Wilson*, 5:23-cv-5034, 2024 WL 3183229, at *5 (W.D. Ark. June 26, 2024) (applying a reasonable-suspicion standard to a child's removal from their parents), *appeal docketed*, 24-2531 (8th Cir. July 23, 2024).

    3.  <u>Municipal Liability</u>

The Court now turns to Plaintiffs' claims asserting municipal liability against St. Louis County.  They argue that the Defendant Officers violated Plaintiffs constitutional rights on June 8, 2017, "pursuant to a practice and custom that was so widespread and well-settled," Doc. [19] ¶ 185, that it had "the effect and force of law" within St. Louis County (Count XIV).  *See Monell v. Dep't. of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978).  They further assert that St. Louis County knew that Defendant Rinck had a history of violating county residents' constitutional rights and that the "training, supervisory, and/or disciplinary policies were inadequate to prevent Defendant Rinck from continuing to engage [in unconstitutional conduct]."  Doc. [19] ¶ 176–77.

As a result, the County's "failures to act with respect to Defendants Rinck's conduct was due to deliberate indifference and was so closely related to [Defendant Rinck's] violations of Ms. Perry's constitutional rights as to be considered a moving factor." *Id.* ¶ 178. Defendants counter that Plaintiffs have failed to establish either of these claims "because Plaintiffs cannot show deliberate action attributable to the municipality directly caused a deprivation of their constitutional rights." Doc. 76 ¶ 6(g).

As relevant to both Count XIII and Count XIV, a municipality cannot be held liable "based solely on the vicarious liability theory of *respondeat superior*." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). That is, "a municipality cannot be held liable solely because it employs a tortfeasor." *Monell*, 436 U.S. at 691. Thus, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *S.M. v. Lincoln County*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997)). To that end, a successful municipal liability claim first requires a constitutional injury caused by a municipal employee. *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotations omitted). Then the plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the moving force behind the [constitutional injury]." *Brown*, 520 U.S. at 404. In other words, there must be "a direct causal link between a municipal policy or custom [or a failure to train, supervise, or discipline] and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Here, for the purposes of summary judgment, the Court has found two violations of Plaintiffs' Fourth Amendment rights: (1) Officer Rinck's search of Plaintiff's home without her voluntary consent, and (2) Officer Rinck and Officer Fingers' indefinite seizure of Plaintiff's

33

home until such time that she and her domestic partner would allow crime-scene investigators inside.[15]  Thus, the question before the Court is whether Plaintiffs have submitted sufficient evidence from which a reasonable factfinder could conclude that actions of St. Louis County— that is, a properly supported municipal custom or a failure to train, supervise or discipline its officers—were the moving force behind either of the two constitutional injuries identified above.

a.  Unconstitutional Custom (Count XIV)

A municipal 'custom' is an unofficial practice that "may subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404.  As the Eighth Circuit has explained, a plaintiff asserting municipal liability based on an unofficial custom by demonstrating:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials of the misconduct; and (3) that the plaintiff was injured by acts pursuant to the municipality's custom, i.e., that the custom was the moving force behind the constitutional violation."

*Mick v. Raines*, 883 F.3d 1075, 1079–80 (8th Cir. 2018) (citing *Mettler*, 165 F.3d at 1200). "Deliberate indifference in this context 'is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'"  *S.M.*, 874 F.3d at 585 (quoting *Brown*, 520 U.S. at 410).

To show a widespread pattern of misconduct, Plaintiffs direct the Court to various St. Louis County Bureau of Professional Standards ("BPS") complaints submitted against Officer Rinck alleging, among other things, that he engaged in "oppressive exercise[s] of authority." *See, e.g.*, Doc. [141-5] (under seal).  Between 2001 and 2017, County personnel records show

---

[15] It makes no difference that the Court granted Officer Rinck and Officer Fingers qualified immunity for this seizure.  "[B]efore a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb*, 889 F.3d at 487 (internal quotations omitted).

eighteen citizen complaints alleging that Officer Rinck acted oppressively in his dealings with County residents. *Id.* These vary widely and range from allegations of excessive force to complaints of rude behavior exhibited during police encounters. *See, e.g.*, *id.* at 6–7. But four additional complaints from 2014 to 2016 accuse Officer Rinck of harassment while acting on behalf of the PPU. *Id.* at 8–10. And, most relevant to the unlawful search in this case, three complaints accuse Officer Rinck of searching homes without permission. *Id.* at 6–8. In addition, Captain Guy Means ("Capt. Means"), commander of the St. Louis County Police, First Precinct, has testified to the existence of verbal complaints made against Rinck that alleged: "[t]here's things that he does to get in the residence, basically by just telling them that he's going to light them up or he's going to cite them for this or that if he doesn't get in there." Doc. [127-3] at 84–85. In addition, "[t]hey complained that he was oppressive to get in their houses." *Id.* at 65.

The Court notes that Officer Rinck was a defendant in a prior § 1983 action challenging his conduct during a PPU investigation in 2014. *Zorich v. St. Louis County*, 4:17-cv-1522-PLC, 2018 WL 6621525, at *1 (E.D. Mo. Dec. 18, 2018). There, the court reviewed many of the same BPS complaints alleging an "oppressive exercise of authority." *Id.* at *29. The *Zorich* court found one additional piece of evidence persuasive, namely that Officer Rinck was a defendant in an additional § 1983 lawsuit in 2011—eventually settled—alleging, among other things, that Officer Rinck forced his way into the plaintiff's home after the plaintiff opened the door. *Id.* at *30.[16] Additionally, after the plaintiff in *Zorich* submitted a complaint to St. Louis County describing the events of her eventual lawsuit, she received a letter from BPS two days later dismissing her complaint because investigators concluded that the officer's use of force had been proper. *Id.* By contrast, the *Zorich* court ultimately held that the same use of force violated

---

[16] The Court "may take judicial notice of judicial opinions and public records." *Stuzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005).

clearly established law.  *See id.* at *14, 21.  The court denied St. Louis County's motion for summary judgment, stating: "based on the above evidence, a reasonable jury could find that Defendant County had a custom of ignoring citizen complaints about Rinck . . . [because] [w]hile [oppressive conduct] is a broad classification, it appears that the prior complaints involved misconduct similar to the alleged unconstitutional actions in this case."  *Id.* at *30.

Defendants argue that the various complaints cannot demonstrate a pattern of unconstitutional misconduct because each complaint was investigated by BPS officials, and they either exonerated Officer Rinck, determined that the complaints were unfounded,  *see, e.g.*, Doc. [141-5] at 6, or reviewed the verbal complaints and decided they did not need to be pursued further.  Doc. [127-4] ("All complaints that come into [BPS] go through at least a preliminary investigation.").  Although it is true that "the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging [unconstitutional conduct]," *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999), "[e]vidence that a police department failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists."  *Id.*

The record shows that BPS has *never* found a citizen complaint against Officer Rinck to be meritorious, including a complaint describing PPU-related conduct that a federal court later found to violate clearly established law, *see Zorich*, 2018 WL 6621525, at *14, 21.  In addition, verbal complaints describing the same conduct at issue here received, at most, a preliminary review that went no further.  On that basis, a reasonable factfinder could conclude that the BPS investigations were inadequate or otherwise perfunctory.  *See Mettler*, 165 F.3d at 1205 (refusing to find municipal liability, in part, because plaintiff failed to produce evidence that investigations into complaints were inadequate).  Additionally, because several past complainants specifically

allege that Officer Rinck entered their homes without consent, a reasonable jury could find that "Defendant County's custom of inaction towards allegations of [such] 'oppressive' conduct was the 'moving force' behind [the unlawful search of Plaintiff's home]."  *Zorich*, 2018 WL 6621525, at *30; *see also Rogers v. City of Little Rock*, 152 F.3d 790, 798–99 (8th Cir. 1998) (explaining that municipal liability can be found where "the city had a policy or custom of failing to act upon similar complaints of unconstitutional misconduct," and there is "some showing that the complaints had merit").

But even if that evidence were not enough to establish a municipal custom, Plaintiffs provide more.  Mr. Cross, a former PPU inspector who regularly worked with Officer Rinck, submits an affidavit stating that he repeatedly witnessed Officer Rinck use coercive tactics to enter the homes of County residents.  Doc. [127-14] ¶ 15.  He states that it was a particularly common tactic for Officer Rinck to "[leverage] property owners' children against them."  *Id.* ¶ 16.  "[Officer Rinck] would threaten to take the children or contact the Division of Family Services if they did not consent to a search of their homes." *Id.*  Mr. Cross therefore describes a "persistent pattern of misconduct" on the part of Officer Rinck.  *See Mick*, 883 F.3d at 1079; *see also Watson v. Boyd*, 447 F. Supp. 3d 924, 950 (E.D. Mo. 2020) (finding a municipal custom based upon the misconduct of a single officer).

Mr. Cross also asserts that he informed both Sergeant Rodriguez and Captain Means of this behavior.  *Id.*; Doc. [127-3] at 27.  He describes seeing Officer Rinck return from meetings with officials in the County Counselor's office and the County Executive's office with lists of addresses for the PPU to either enforce on or investigate.  Doc. [127-14] ¶¶ 6–7.  Relatedly, as it pertains to PPU search warrants and orders to vacate, Officer Rinck was "the only one that did them for the north and the south ends [of the County]."  Doc. [83-13] at 179.  He also had a

reputation within the County; specifically, "if you wanted something done, he was known as the enforcer.  He would get it done . . . [h]e could find violations that maybe another inspector could not find."  *Id*.

### i.  Municipal custom as applied to the Unlawful Search

Viewing the above evidence in a light most favorable to Plaintiff, a reasonable jury could find that St. Louis County officials tacitly authorized, or were deliberately indifferent to, Officer Rinck's widespread and persistent use of strong-arm tactics to further PPU enforcement activities and investigations.  Multiple verbal and written complaints as well as previous lawsuits have alleged that Officer Rinck used coercive or aggressive tactics to enter people's homes, a former co-worker describes seeing such conduct repeatedly and informing police supervisors of that conduct, and Officer Rinck allegedly received direction form officials in the County Executive and County Counselor's offices concerning PPU enforcement activities.

Such evidence supports an inference that St. Louis County policymakers knew or should have known about Officer Rinck's misconduct and either permitted it or ignored it.  And, given the similarity of the tactics described by Mr. Cross and mentioned in complaints to those Officer Rinck allegedly employed during the unlawful search of Plaintiff's home, there is sufficient evidence that the County's custom was the "moving force" behind the unlawful search of Plaintiff's home.  *See Harris*, 821 F.2d at 507–08.  (finding municipal liability where a municipal custom proximately caused plaintiff's injury).  Accordingly, the Court will deny summary judgment on Count XIV as it relates to the unlawful search of Plaintiff's home.

### ii.  Municipal custom as applied to the Unlawful Seizure

The same cannot be said for Officer Rinck and Officer Fingers' unlawful seizure.  As previously explained, once a plaintiff demonstrates the existence of a municipal custom, he or

she must also have been "injured by acts pursuant to the governmental entity's custom." *Jane Doe v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Harris*, 821 F.2d at 504–07). And in this context, "rigorous standards of culpability and causation must be applied." *S.M.*, 874 F.3d at 585 (citation omitted).

Although the testimony of Mr. Cross, statements of other County officers, and the BPS complaints support, for purposes of summary judgment, the existence of a St. Louis County custom furthering Officer Rinck's coercive tactics used during PPU investigations, none of that evidence relates to blanket seizures of real property that occurred *after* a PPU investigation had culminated in an order to vacate. Mr. Cross does not describe any seizures of real property beyond the issuance of such orders. Nor do any of the BPS complaints cited by Plaintiff contain allegations similar to the seizure here. In short, there is insufficient evidence in the record for a reasonable jury to find that the custom described above proximately caused Officer Fingers and Officer Rinck's decision to "seal" Plaintiff's home pending further crime-scene investigation.[17] Accordingly, the Court will grant Defendant St. Louis County summary judgment on Count XIV as it pertains to the unlawful seizure of Plaintiffs' home.

b. <u>Municipal Failure to Train, Supervise, and/or Discipline (Count XIII)</u>

As mentioned above, Plaintiff claims that "St. Louis County's training, supervisory, and/or disciplinary policies were inadequate to prevent Defendant Rinck from [violating her constitutional rights]." Doc. [19] ¶ 177. Additionally, Plaintiff asserts that those policy failures occurred due to the County's deliberate indifference, and the failures proximately caused the

---

[17] If anything, the record indicates that this seizure was the type of "isolated incident" that, in general, does not support a finding of municipal liability, absent other findings that are not present here. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007); *see also Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citing *Wedemeier v. City of Baldwin*, 931 F.2d 24, 26 (8th Cir. 1991)) ("Generally, an isolated incident of alleged police misconduct . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983.").

Plaintiff's constitutional deprivations. Doc. [19] ¶ 178. Because all three of these alleged failures require substantially similar analyses, the Court addresses them together.

The Eighth Circuit has explained that municipal failure to train and municipal failure to supervise claims "ultimately require the same analysis." *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998). To hold the County liable, Plaintiff must "prove that the [County's] failure to supervise and train amounts to deliberate indifference to the rights of persons with whom [Officer Rinck] came into contact." *Doe v. Fort Zumwalt R-II Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019). "A pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." *Id.* (internal quotations and alterations omitted). Alternatively, Plaintiff may show that "the need for more supervision or training was 'so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *Canton*, 489 U.S. at 390). Similarly, to hold St. Louis County liable for its failure to discipline, Plaintiff "must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996).

Taken together, claims asserting a failure to train, discipline, or supervise are all analyzed under a deliberate indifference standard. *Compare S.M.*, 874 F.3d at 585 (applying a deliberate indifference standard to both failure to train and failure to supervise claims), *with Ware v. Jackson County*, 150 F.3d 873, 882–83 (8th Cir. 1998) (applying deliberate indifference in the context of a failure to discipline); *see Vineyard v. County of Murray*, 990 F.2d 1207, 1211–12 (11th Cir. 1993) (citing *Canton*, 489 U.S. at 389) (resolving inadequate training, supervision, and discipline claims together under a deliberate indifference standard). When such claims are made

40

against a municipality rather than an official in his or her individual capacity, the standard for

deliberate indifference is an objective one, and liability "can be premised on obviousness or

constructive notice." *Fort Zumwalt*, 920 F.3d at 1189.  And that notice is generally demonstrated

by similar instances of past unconstitutional misconduct.  *Compare id.* ("A pattern of similar

constitutional violations is ordinarily necessary to demonstrate deliberate indifference."), *with*

*Harris*, 821 F.2d at 506 (imposing municipal liability for a failure to take remedial action where

officials had notice of a pattern of similar police misconduct, and that notice amounted to

deliberate indifference toward that misconduct).  Lastly, "[t]he [County's] failure to supervise or

train [or discipline] must be the moving force behind the constitutional violation.  *Id.* (citing

*Canton*, 489 U.S. at 389); *see Vineyard*, 990 at 1213 ("[T]he proper inquiry [is], 'Would the

injury have been avoided had the employee been trained and supervised and disciplined under a

program that was not deficient in the identified respects?'" (quoting *Canton*, 489 U.S. at 391)).

Having already found, for purposes of summary judgment, sufficient evidence of a

pattern of similar constitutional violations that St. Louis County either authorized or deliberately

ignored above, the Court finds that a reasonable factfinder could conclude that such a pattern

"would alert the [County] that its training and supervision [and disciplinary policies] were

insufficient to prevent [Officer Rinck's] conduct."  *Fort Zumwalt*, 920 F.3d at 1190.

Additionally, because that pattern of misconduct closely resembles the coercive tactics Officer

Rinck used against Plaintiff to unlawfully search her home, there is a genuine dispute of material

fact as to whether the County's insufficient training, supervision, and discipline was "the moving

force" behind the unlawful search.  *Id.* at 1189.  In other words, a reasonable jury could find that,

had the County responded to Officer Rinck's pattern of misconduct with additional or different

training, supervision, or disciplinary practices, the unlawful search of Plaintiff's home would not have occurred.

However, once again, the Court finds the opposite regarding Officer Fingers and Officer Rinck's unlawful seizure of Plaintiff's home pending further crime-scene investigation. There is insufficient evidence in the record to show "a pattern of misconduct" or "prior incidents of police misconduct" pertaining to such seizures that would put the County on constructive notice that it needed to change its training, supervision, or disciplinary practices to prevent that seizure from taking place. As such, there is no showing that the County was deliberately indifferent to this misconduct. *See id*. at 1190 (finding no municipal liability where plaintiff failed to show "a pattern of misconduct" alerting the municipality that its policies were inadequate). Accordingly, the court will deny summary judgment on Count XIII but only as it pertains to Officer Rinck's unlawful search.

To summarize further, the Court finds that Plaintiff has met her summary-judgment burden as to her municipal liability claims (Counts XIV and XIII), but only to the extent that Defendant St. Louis County's custom or its failures to train, supervise, and discipline proximately caused the unlawful search of her home.

### 4. Failure to Train, Supervise, and/or Discipline against Speight (Count XVI)

The Court next addresses Plaintiff's claim against Chief Inspector Speight in his individual capacity—as opposed to the municipal-liability claim above—asserting that he knew of Officer Rinck's unconstitutional misconduct and, despite that knowledge, maintained inadequate "training, supervisory, and/or disciplinary policies." Doc. [19] ¶¶ 198–99. Moreover, Plaintiff claims that those inadequate policies were a moving factor behind the constitutional violations that Plaintiff suffered. *Id.* at ¶ 200. Defendants respond that this claim fails as a

matter of law because Chief Inspector Speight was not a supervisor of Officer Rinck and, therefore cannot be held liable on that basis.  Doc. [76] ¶ 6(f).  In the alternative, Defendants assert qualified immunity.  *Id.*

"A supervisor may be liable under § 1983 if he (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018) (internal quotations omitted).  This is a "rigorous standard [that] requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right.  Allegations of generalized notice are insufficient . . . [and the] other misconduct must be very similar to the conduct giving rise to liability."  *S.M. v. Krigbaum ("S.M. I")*, 808 F.3d 335, 340 (8th Cir. 2015).  Moreover, "when the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard that requires personal knowledge of the constitutional risk posed by inadequate supervision." *S.M. v. Lincoln County ("S.M. II")*, 874 F.3d 581, 585 (8th Cir. 2017).

The Court will assume for the purposes of this order that Chief Inspector Speight is a supervisor of Officer Rinck.  It is undisputed that, as of June 8, 2017, Officer Rinck's direct supervisor was Sgt. Rodriguez, Doc. [145] ¶ 96, and although Chief Inspector Speight denies having any supervisory authority over Officer Rinck, Doc. [128-2] at 129, other evidence in the record indicates that he did have a supervisory role over Officer Rinck's activities, at least as they related PPU building inspections.  *See, e.g.*, Doc. [145-1] (an email from Officer Rinck to Chief Inspector Speight containing findings from the investigation of the Underhill property).  Still, even if Chief Inspector Speight is a supervisor of Officer Rinck for purposes of § 1983, Plaintiffs have put forth insufficient evidence to raise a genuine dispute of fact that Chief

43

Inspector Speight had actual notice of a "pattern of conduct by [Officer Rinck] that violated a clearly established constitutional right." *S.M. I*, 808 F.3d at 340.

Plaintiff points to various portions of the record attempting to show that Chief Inspector Speight had personal knowledge of Officer Rinck's unconstitutional misconduct, but the record simply does not indicate that Chief Inspector Speight had such knowledge.  First, in his affidavit, Mr. Cross states that "everyone, including Mr. Speight knew" about PPU-related misconduct on the part of Officer Rinck,  Doc. [127-4] ¶ 5, but such "allegations of generalized notice" are insufficient here.  *See S.M. I*, 808 F.3d 335 at 840.  Although he testifies that he *told* Sgt. Rodriguez and Capt. Means of Officer Rinck's coercive tactics, *id.* at ¶ 16, he does not say that he had the same conversation with Chief Inspector Speight.  Rather, Mr. Cross states only that "Mr. Speight never addressed any of the serious problems I raised about Rinck" to Sgt. Rodriguez and Capt. Means.  That may be true, but it does nothing to demonstrate that Chief Inspector Speight personally *knew* of those serious problems.

Next, Plaintiff points to Chief Inspector Speight's testimony stating that he knew Officer Rinck was "in trouble" with Sgt. Rodriguez and Capt. Means, *see* Doc. [128-2] at 106–09, but there is no indication that he knew any details of *why* they might have been angry.  She also cites Sgt. Rodriguez's testimony in which he states that he and Capt. Means met to discuss the information that they received from Mr. Cross.  Doc. [83-13] at 98–102.  But, as he describes the substance of that meeting, he mentions only issues relating to interpersonal workplace problems between Mr. Cross and Officer Rinck.  *Id.* at 101–02 ("For example, Mike Cross told me that whenever he called in sick . . . [h]e had to call Rob Rinck first.").  At no point does Sgt. Rodriguez mention coercive tactics used by Rinck or any other misconduct "that violated a clearly established constitutional right."  *See S.M. I*, 808 F.3d at 840.  That was the only time

Sgt. Rodriguez and Capt. Means met with Chief Inspector Speight to discuss such issues.  Doc. [83-13] at 102 (Q. "Did you ever talk to Marcellus again about that, or was that the only occasion? A. "I think that was the only occasion.").

Because Plaintiff has failed to put forth any evidence demonstrating that Chief Inspector Speight "received notice of a pattern of unconstitutional acts committed by [Officer Rinck]," *Rogers*, 885 F.3d at 1122, Plaintiff has failed to meet the "rigorous standard" that this claim requires, *S.M. I*, 808 F.3d at 840.  Accordingly, the Court will grant Defendant Chief Inspector Speight summary judgment on Count XVI.

### IV.    Motion to Appoint Defendant Ad Litem

Plaintiffs move to appoint a Defendant *Ad Litem* for Officer Ellis, now deceased. Doc. [151].  Because the Court will grant summary judgment on all counts pertaining to Officer Ellis, and he will no longer be a party, the Court will deny Plaintiffs' Motion as moot.

### <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [76], is **GRANTED IN PART AND DENIED IN PART** in accordance with this Memorandum and Order.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiffs' Affidavits, Doc. [143], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Second Motion to Appoint an Attorney ad Litem, Doc. [151], is **DENIED** as moot.

Dated this 18th day of October 2024.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

45